UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MAX BENNETT, | * |
| | * |
| Plaintiff, | * |
| | *  Civil Action No. 13-cv-12277-IT |
| v. | * |
| | * |
| ABIOMED, INC., | * |
| | * |
| Defendant. | * |

MEMORANDUM & ORDER

March 24, 2020

TALWANI, D.J.

Plaintiff Max Bennett alleges that his former employer, Abiomed, Inc. ("Abiomed"), fired him in retaliation for his investigation of federal False Claims Act ("FCA") violations. However, based on the factual record before the court, viewed in the light most favorable to Bennett, no reasonable jury could find that Bennett engaged in protected activity or that he was terminated in retaliation for protected activity. Accordingly, for the reasons discussed below, the court GRANTS Abiomed's Motion for Summary Judgment [#137].

I. **Procedural Background**

Bennett initiated this action as a *qui tam* action alleging violations of the federal False Claims Act ("FCA"), the Anti-Kickback Statute, and unlawful retaliation under the FCA. Compl. ¶¶ 33-43 [#1]. Bennett amended the complaint the following year to add claims under various states' false claims acts and wrongful termination in violation of Massachusetts law. Am. Compl. [#16].

Several years later, the United States filed a Notice of Intervention [#78]. The Notice reported that the United States, the Relator, and the Defendant reached an agreement to resolve

the *qui tam* action and that the government's intervention would be for the purposes of settlement. Shortly thereafter, the parties filed a Stipulation of Dismissal [#79] agreeing to dismissal of all but the retaliation and wrongful termination claims.

On June 1, 2018, Plaintiff filed his Second Amended Complaint [#91], which is now the operative complaint. The Second Amended Complaint alleges retaliation under the FCA and wrongful termination in violation of public policy under Massachusetts law. Following discovery, Defendant filed the pending Motion for Summary Judgment [#137].

## II. Factual Background

Before starting his employment with Abiomed, Bennett was employed by Biotronik, Inc. ("Biotronik"), a medical device company. Pl.'s Responses to Def.'s Rule 56.1 Statement ("Pl.'s SOF") ¶ 1 [#144]. In April 2010, Biotronik terminated Bennett's employment by firing him. Pl.'s SOF ¶¶ 1, 7 [#144]; Exhibit 4, Bennett Dep. 133 [#141-4].

About a year later, on April 2, 2011, the New York Times reported that the federal government was investigating Biotronik's marketing and sales practices. Exhibit 33, April 2, 2011, New York Times Article 3 [#144-2]. The article stated that the New York Times had spoken to multiple sources, including Bennett, and had reviewed documents provided by Bennett to the New York Times. Id. The article reported further that Bennett had provided the New York Times with a copy of Biotronik's letter firing him, in which Biotronik alleged that Bennett had falsified company records. Id. According to the article, Bennett denied Biotronik's allegation and asserted that he was fired after bringing inappropriate physician payments to the attention of Biotronik officials. Id. The article reported that Bennett and Biotronik were in arbitration over Bennett's firing. Id.

On May 31, 2011, the New York Times published a second article on the Biotronik allegations. Exhibit 3, May 31, 2011, New York Times Article [#141-3]. The second article

reported that the DOJ investigation was continuing and referenced the documents provided by Bennett for the April 2, 2011 article. Id. at 3. The second New York Times article also stated that Bennett reported that "he had been fired after he complained to company executives about corporate wrongdoing." Id. at 3.[1]

Four months later, on September 13, 2011, Bennett and Biotronik entered into an Arbitration Termination Agreement ("Agreement"). Pl.'s SOF ¶ 3 [#144]; Exhibit 18, Agreement [#141-18]. The Agreement included a confidentiality provision requiring that "[t]he terms of this Agreement shall remain strictly confidential," and that "[i]n the event a third party contacts either Party about this Agreement, the third party shall be informed only that: (1) the Parties did not settle the Arbitration; and (2) all claims alleged in the Arbitration were withdrawn, dismissed with prejudice, and released." Exhibit 18, Agreement ¶ 2 [#141-18]. In a further paragraph on "Third Party Inquiries" about Bennett's employment history and eligibility for rehire, the Agreement limited Biotronik's response (absent a court order) to Bennett's dates of service, job title, compensation, and that his potential employment with a non-Biotronik entity does not violate any obligations owed by Bennett to Biotronik, other than those relating to confidentiality. Id. ¶ 8.

The following summer, Bennett was introduced to Abiomed by a recruiter. Pl.'s SOF ¶ 4 [#144]. During an initial interview with David Stevens, Abiomed's Director of Sales for the Southeast Region, Stevens questioned Bennett on his reason for leaving Biotronik given that

---

[1] At the time of these articles and the events at issue here, the United States apparently was investigating allegations against Biotronik raised in two *qui tam* actions, one of which had been filed by Bennett. See United States ex rel. Bennett v. Biotronik, Inc., 876 F.3d 1011, 1014 (2017); Exhibit 4, Bennett Dep. 12:7-10 [#141-4]. Those cases were under seal until 2014, however, and there is no evidence in the record that Bennett mentioned his sealed *qui tam* action to the New York Times. In any event, the articles made no mention of any *qui tam* action.

3

Biotronik was "growing" and "doing well." Exhibit 5, Stevens Dep., 22:20-24 [#141-5]. Bennett responded that he left because Biotronik "was changing its business model and Bennett felt the company should be going in a different direction." Id.; Pl.'s SOF ¶ 4 [#144]. Bennett characterized his departure as amicable and based on Bennett's desire to try his hand at being a consultant. Exhibit 5, Stevens Dep., 22 [#141-5].

On September 11, 2012, Bennett interviewed in-person with five members of Abiomed's executive team. Pl.'s SOF ¶ 6 [#144]. Two of the interviewers held concerns about hiring Bennett because they thought he had been vague and evasive about transitions in his resume, including his reason for leaving Biotronik to work as a consultant. Id. On September 18, 2012, based in part on these concerns, Stevens called Bennett to further discuss, among other things, the circumstances of his departure from Biotronik. Id. ¶ 7. Bennett provided a response on the phone and also followed up with an email to Stevens. Id. Bennett wrote, in pertinent part, "In 2010, I left Biotronik due to changes in the business model. Biotronik chose to pursue an independent model vs. a direct model, which in turn minimized the functional need for management positions. I signed a non-disclosure and took a severance option at that time. Given my entrepreneurial personality and strong network in the industry, I decided to try my own consulting." Id.; Exhibit 19, email from Bennett to Stevens [#141-19]. Bennett states that the agreement he was referencing was the Arbitration Termination Agreement. Exhibit 4, Bennett Dep. 46:2-10 [#141-4].

On September 26, 2012, Abiomed hired Bennett to be Abiomed's Director of Clinical Operations for the Southeast Region. Pl.'s SOF ¶ 8. Bennett started the new position on October 15, 2012. Id. at ¶ 9. Bennett's responsibilities included managing clinical consultants, which involved developing, training, and monitoring employees under his supervision. Id. Bennett was

4

responsible for reviewing and approving expense reports so as to ensure compliance with Abiomed's travel and expense policies. Id.

On October 17, 2012, two days after Bennett started at Abiomed, Bennett asked Abiomed's Senior Director of Finances, Lori Wedge, about Abiomed's policy on entertainment spending in the context of the Sunshine Act. Exhibit 13, Chronology of Events 3 [#141-13]; Exhibit 4, Bennett Dep. 102-103 [#141-4]. Wedge responded that Bennett should not worry about the Sunshine Act because the law was in draft form and could be repealed after upcoming elections. Id.

On November 5, 2012, Bennett emailed Stevens a question about spending limits for entertaining health care providers ("HCPs"). Exhibit 29, Email from Bennett to Stevens [#141-29]. Stevens responded by forwarding Bennett the expense policy, to which Bennett responded that he had read it and that it did "not say anything about HCPs." Exhibit 28, Email from Stevens to Bennett [#141-28]. Stevens then forwarded Bennett's first email to Lori Wedge and another employee, asking them to "provide Max with the information requested below." Exhibit 29 Email from Stevens to Wedge [#141-29]. Because Bennett did not find Stevens' response helpful, he followed up with Stevens by phone on that same day. Exhibit 4, Bennett Dep. 99-100 [#141-4]. Stevens again directed Bennett to the travel and expense policy. Id.

Sometime in early November 2012, Stevens "bumped into" a Biotronik employee and the two exchanged pleasantries. Exhibit 5, Stevens Dep. 63:19-24 [#141-5]. During the conversation, Stevens mentioned that he had recently hired Bennett, a former Biotronik employee. Id. In response, the Biotronik employee said to Stevens: "google his name." Id. at 63:24. Stevens did so and came across one of the 2011 New York Times articles concerning the Biotronik investigation that reported Bennett as having been fired from Biotronik. Pl.'s SOF ¶¶ 10-11

[#144]. Stevens told both Vice President of Global Sales Michael Howley and Vice President of Human Resources Frank LeBlanc what he had found. Id. ¶ 10; Exhibit 7, LeBlanc Dep. 7:50-51 [#141-7]. Although the exact date of these conversations is not known, the record shows that Howley emailed LeBlanc a link to one of the New York Times articles on Friday, November 9, 2012, at 1:53 p.m. Exhibit 32, email from Howley to LeBlanc [#144-1].

LeBlanc directed Jim Ziegra, an employee in the HR department, to contact both the background checking service and Abiomed to gather more information on Bennett's employment history at Abiomed. Exhibit 7, LeBlanc Dep. 55:12-24 [#141-7]. At 3:54 p.m. on Friday, November 9, 2012, Ziegra reported that his team had attempted to "verify [Bennett's] employment," and that they had "left 4 messages with [Biotronik's employment verification employee] who has not yet returned a call but we are calling back every 20-30 minutes." Exhibit 35, email from Ziegra to Howley [#144-4]. All Biotronik was willing to share, however, were Bennett's dates of employment and job title. Exhibit 36, email from Ziegra to LeBlanc and Howley [#144-5]. Biotronik "refused to comment or elaborate" on whether Bennett was eligible for re-hire. Id.; Exhibit 7, LeBlanc Dep. 55-56 [#141-7].

Stevens and LeBlanc decided late that same Friday afternoon that they would meet with Bennett on Tuesday,[2] November 13, 2012, to get an explanation as to why Bennett misrepresented how his employment ended at Biotronik. Pl.'s SOF ¶ 11 [#144]; Exhibit 7, LeBlanc Dep. 58:12-20 [#141-7]. At 3:37 p.m., on November 13, 2012, Stevens sent LeBlanc an email containing the following:

> Bottom line is that I can't see getting past the fact that it appears that Max outright lied to us about being terminated (fired) from Biotronik. This is not something that can be attributed to confusion or a misunderstanding, as the circumstances of his situation at Biotronik was a focus of our interview, and even a follow-up

---
[2] Monday, November 12, 2012, was Veterans Day (observed).

communication . . . . As you know me, this is less that he was fired, as he might have presented a good explanation to us that we would have considered. Rather, it is the fact that he was not transparent (or honest) about the circumstances. At the end of the day, this becomes a fundamental trust issue, which is a character attribute that is very high on my list.

While I will leave open the remote possibility that Max has some explanation as to why he was not truthful. If that occurs, we can confer more before we make a final decision. Absent that, however, I would move forward with the termination decision after we meet with him.

Let's discuss before we meet with Max.

Pl.'s SOF ¶ 11 [#144].

Bennett met with LeBlanc and Stevens at approximately 5 p.m. on Tuesday, November 13, 2012. Exhibit 4, Bennett Dep. 61:13-21 [#141-4]; Exhibit 12, Bennett Notes [#141-12]. During the meeting, LeBlanc confronted Bennett about "misrepresentations [Bennett] made during the interview process." Exhibit 4, Bennett Dep. 61:19-62:7 [#141-4]. Bennett responded that he could not discuss his departure from Biotronik for legal reasons. Id. at 63:1-4.[3] Bennett was informed that his termination was under consideration. Pl.'s SOF ¶ 12 [#144]; Exhibit 7, LeBlanc Dep. 67:16-18 [#141-7]. Immediately after the meeting, LeBlanc and Stevens conferred and decided to terminate Bennett. Pl.'s SOF ¶ 13 [#144]; Exhibit 5, Stevens Dep. 76:9-16 [#141-5].

Later that evening, Bennett called Stevens to "plead with him" for Bennett's job. Pl.'s SOF ¶ 13 [#144]; Exhibit 4, Bennett Dep. 68:6 [#141-4]. Bennett recalls Stevens saying that he "would pray on it overnight" and that the problem was that Bennett had "a reputation in the

---

[3] Bennett asserts that "to this day, his arbitration agreement insisted on confidentiality" and that he understood that his *qui tam* case against Biotronik was under seal, preventing him from discussing it. Pl.'s SOF ¶ 12 [#144]. Even assuming that Bennett's arbitration agreement and the *qui tam* action did prevent him from discussing the circumstances of his departure from Biotronik, Abiomed was still left with the contradiction that Bennett had stated to the New York Times that he had been fired, and had stated to Abiomed during the hiring process that his departure from Biotronik was "amicable."

7

industry." Exhibit 4, Bennett Dep. 68:10-13 [#141-4]. Stevens disputes that he said this. Exhibit 5, Stevens Dep. 78:1-13 [#141-5].

Shortly after the call between Bennett and Stevens, Bennett sent an email to LeBlanc. Exhibit 14, 7:22 p.m. email from Bennett to Leblanc [#141-14]. In the email, Bennett stated that he found it his "professional obligation" to share several concerns with LeBlanc. Id. These included that Bennett had not been able to understand the governing policies of Abiomed regarding the entertainment of health care providers. Id. Bennett also inquired about the spending limits per healthcare provider and relayed his previous difficulty getting answers from Stevens regarding applicable policies. Id. Bennett suggested that Abiomed adopt a compliance training program for all field staff and a detailed policy with regard to entertainment of health care providers. Id.

The next morning, November 14, 2012, Bennett sent another email to LeBlanc. Exhibit 16, 7:26 a.m. email from Bennett to LeBlanc [#141-16]. This email raised two additional concerns that Bennett wanted to discuss: First, that Bennett had sometimes been "uncomfortable" when he was working with Howley due to Howley's behavior; Second, Bennett raised a concern about another employee making sexual innuendos during a meeting. Id.

Later that morning, LeBlanc and Stevens met with Bennett and terminated his employment. Pl.'s SOF ¶ 17 [#144]. LeBlanc stated in an email to Bennett sent shortly after the meeting that Bennett was fired due to dishonesty in the hiring process. Exhibit 17, email from LeBlanc to Bennett [#141-17]. Bennett responded that his "understanding is that I was terminated today based on unanswered questions regarding my departure from Biotronik." Exhibit 10, email from Bennett to LeBlanc [#141-10]. In the same email, Bennett stated, once more, that he could not answer questions about his time at Biotronik due to "confidentiality

issues." Id. Bennett also wrote that his emails had identified "compliance concerns" and he noted that Abiomed has "a non-retaliation policy once such issues are reported to HR." Id.

### III. Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." Baker v. St. Paul Travelers, Inc., 670 F.3d 119, 125 (1st Cir. 2012) (quoting Scottsdale Ins. Co. v. Torres, 561 F.3d 74, 77 (1st Cir. 2009)). "A fact is 'material' if it has the potential of determining the outcome of the litigation." Id.

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). In so doing, the court properly "give[s] no heed to speculative, unsupported, or unreasonable conclusions." Showtime Entm't, LLC v. Town of Mendon, 769 F.3d 61, 69 (1st Cir. 2014).

### IV. Analysis

#### A. Retaliation Claim under Federal False Claims Act

The FCA provides relief for any employee who is discharged "because of lawful acts done by the employee . . . in furtherance of an action under [the FCA]." 31 U.S.C. § 3730(h)(1). To prevail on an FCA retaliation claim, "a plaintiff must show that 1) the employee's conduct was protected under the FCA; 2) the employer knew that the employee was engaged in such conduct; and 3) the employer discharged or discriminated against the employee because of his or her protected conduct." Guilfoile v. Shields, 913 F.3d 178, 187–88 (1st Cir. 2019) (citing United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 235 (1st Cir. 2004), abrogated

9

on other grounds by, Allison Engine Co., Inc. v. United States ex rel. Sanders, 553 U.S. 662 (2008)).

The First Circuit has found that the McDonnell Douglas burden-shifting framework provides a "principled mode" for analyzing FCA retaliation claims where there is a question of retaliatory intent. Harrington v. Aggregate Indus. Ne. Region, Inc., 668 F.3d 25, 31 (1st Cir. 2012) (referencing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973)). The framework is a three-step analysis. A plaintiff first must set forth a prima facie case of retaliation. Id. Once this is accomplished, the burden then shifts to the defendant to articulate a legitimate, nonretaliatory reason for the adverse employment action. Id. Importantly, both these steps impose merely a burden of production, not one of proof. Collazo v. Bristol–Myers Squibb Mfg., Inc., 617 F.3d 39, 46 (1st Cir.2010). If the employer is able to produce evidence of a legitimate nonretaliatory reason, it becomes Plaintiff's burden to show that the proffered reason is a pretext calculated to mask a retaliatory firing. Harrington, 668 F.3d at 31. The court proceeds through this analysis step by step, beginning with the question of whether Bennett has put forth a prima facie case.

   1. *Has Bennett Produced Evidence of a Prima Facie Case of Retaliation under the FCA?*

Defendant argued in its moving papers that Bennett cannot establish a prima facie case of retaliation based on emails he sent on the evening of November 13, 2012, because the emails do not allege any submissions of false claims to the government and Bennett sent them after learning he was likely to be terminated. Def.'s Mem. 15 [#138]. In response, Bennett makes no claim that the November 13, 2012, emails caused his termination. Instead, he identifies his conversations with Lori Wedge regarding the Sunshine Act on his third day of work and his November 5, 2012, communications with Stevens concerning Abiomed's policies regarding

entertainment expenses as protected activity. Pl.'s Opp'n 3-4 [#143].

Bennett contends that the court must interpret these two inquiries in the context of Abiomed's knowledge of the New York Times report on his whistleblowing activities, and Stevens' alleged statement that Bennett "had a reputation in the industry." According to Bennett, Abiomed's knowledge of Bennett's past whistleblowing activities gave rise to the concern that his two Abiomed inquiries would develop into a "full blown FCA action." Id. at 6 [#143]; see also id. at 5 [#143] ("Bennett's email of November 5, 2012 and his conversations with Stevens, coupled with Abiomed's knowledge of Bennett's past practice of whistleblowing regarding the precise activities that he was inquiring about here, makes it clear that Bennett was engaged in 'protected conduct' prior to being terminated by Abiomed on November 14, 2012"). Bennett argues that his termination just days after Abiomed learned of the New York Times article confirming his status as a whistleblower allows an inference of a causal connection between his protected activity and his termination. Id. at 7.

Bennett is correct that a showing of temporal proximity between the two events may be enough to establish a prima facie case of causation. Collazo, 617 F.3d at 49 (holding, in the context of a Title VII retaliation claim, that a prima facie case of causation is met simply by showing temporal proximity between the two events).

However, as a matter of law, Bennett's prima facie claim fails where he has produced no evidence that his inquiries amounted to protected activity or that the employer had notice of protected activity.

For most employees, conduct protected by the FCA is broadly interpreted to include any conduct that "reasonably could lead to an FCA action; in other words, investigations, inquiries, testimonies or other activities that concern the employer's knowing submission of false or

11

fraudulent claims for payment to the government." Karvelas, 360 F.3d at 237. However, where an employee's job duties include overseeing government billings or payments, protected conduct does not include the scope of conduct that fall within the employee's regular duties. See Maturi v. McLaughlin Research Corp., 413 F.3d 166, 172 n.16 (1st Cir. 2005) (citing Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 191 (3d Cir. 2001) ("[W]here an employee's job duties involve investigating and reporting fraud, the employee's burden of proving he engaged in 'protected conduct' ... is heightened")). Instead, employees must show actions that "go beyond the assigned task" so as to "make clear their intentions of bringing or assisting in a False Claims Act action in order to overcome the presumption that they are merely acting in accordance with their employment obligations." Hutchins, 253 F.3d at 191 (citing Eberhardt v. Integrated Design & Constr., Inc., 167 F.3d 861, 868 (4th Cir.1999)). And where the employee's job duties involve such oversight, he has a heightened burden of demonstrating that his employer was on notice of his protected activity. Maturi, 413 F.3d at 172–73 (finding heightened notice standard to be met where, for example, the employee put the employer on notice by "characterizing the employer's conduct as illegal or fraudulent or recommending that legal counsel become involved") (internal citation omitted).

Here, Bennett identifies no evidence to support the assertion that he was engaged in any activity at Abiomed that went outside the bounds of his day-to-day employment obligations. Bennett's argument that the inquiries with Wedge and Stevens regarding Abiomed's policies constitute "protected activity" simply miss the mark where it was Bennett's job to review and approve his subordinates' expense reports and ensure that they followed Abiomed's travel and

12

expense policies. Pl.'s SOF ¶ 9 [#144].[4] The court need not determine whether such inquiries may constitute protected activity in other contexts; where it was Bennett's job to know the answers to these questions, the inquiries are not sufficient.

Bennett also has provided no evidence from which a jury could conclude that Abiomed had knowledge that Bennett engaged in protected activity at Abiomed. Again, Bennett's inquiries with Stevens and Wedge do not satisfy the heightened standard applicable here. Instead, the inquiries are routine communications of the type that Bennett would be expected to ask given his role at the company. Nothing in Bennett's inquiries even hints at the proposition that Abiomed is doing something illegal or fraudulent or otherwise indicates that Bennett is concerned about possible FCA violations at Abiomed.

Nor is the court persuaded that otherwise routine inquiries that fall squarely within an employee's day-to-day job duties can be transmogrified into conduct that gives an employer notice of protected activity merely because the employer has knowledge that the employee was previously a whistleblower. If this were the rule, then an employer's knowledge that an employee was previously engaged in whistleblowing activity would render all employee inquiries, even if the inquiries were required as part of the employee's job, to be prima facie evidence of "protected activity." Such a rule paints with too broad a brush.[5]

---

[4] Indeed, in the November 5, 2012, email from Bennett to Stevens, Bennett wrote: "Do we have limits on certain things – for instance per dinner $ per HCP, total number of people at an event, or just a grand total per week per clinical etc. *Just don't want to make any mistakes.*" Exhibit 29, email from Bennett to Stevens [#141-29] (emphasis added).

[5] Bennett's own conduct suggests that, at the time, even Bennett did not think that these inquiries constituted knowledge of protected activity. In the hours after Bennett was told that Abiomed had learned of the New York Times article and was considering firing him for lying during the application process, Bennett sent a series of emails that asserting Bennett's concerns with several of Abiomed's practices. As Bennett stated explicitly in one of these emails, and also admitted in his deposition, these emails were at least in part designed to use anti-relation policies as a shield

13

As Bennett has failed to meet his burden of producing evidence of a prima facie case of retaliation, Abiomed is entitled to summary judgment on Bennett's FCA retaliation claim.

  2.  *Was Abiomed's Reason for Firing Bennett Pretextual?*

Abiomed has produced evidence that it fired Bennett for a legitimate nonretaliatory reason, namely, because Abiomed discovered Bennett made material misrepresentations about how Bennett's employment with Biotronik ended. See Def's SOF ¶¶ 11-13, 17-18 and cited documents (evidence concerning Bennett's termination); Aff. Amy Grubb ¶¶ 2, 3 [#140] (evidence that Abiomed has terminated other employees for dishonesty); Exhibit 7, LeBlanc Dep. 84-87 [#141-7] (same). Accordingly, even if Plaintiff had set forth a prima facie case of retaliation, he is still required to show that Abiomed's reason for firing him was pretextual.

Bennett argues that Abiomed's stated explanation for the termination is mere pretext for the real reason: Bennett's engagement in activity protected under the FCA. Pl.'s Opp'n 10-11 [#143]. At this stage of the analysis, courts focus on the central inquiry: "whether there is sufficient evidence of pretext and retaliatory animus to make out a jury question." Harrington, 668 F.3d at 31 (internal quotation omitted). To meet this bar, Bennett must "raise a genuine issue of fact as to whether retaliation motivated the adverse employment action." Collazo, 617 F.3d at 50. "It is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991) (in the context of a retaliation claim under the Age Discrimination in Employment Act). Although Bennett may satisfy his burden through

---

against his impending termination. See Exhibit 4, Bennett. Dep. 80:10-12 [#141-4]; exhibit 10, email from Bennett to LeBlanc [#141-10].

14

circumstantial evidence and inference, he cannot defeat the summary judgment motion "by relying upon conclusory allegations, improbable inferences, acrimonious invective, or rank speculation." Ahern v. Shinseki, 629 F.3d 49, 54 (1st Cir. 2010).

Here, Plaintiff's only evidence in support of pretext draws upon implausible inferences and speculation. Specifically, Plaintiff points to the following evidence to defeat Defendant's summary judgment motion: 1) the temporal proximity between Bennett's inquiry about Abiomed's policies on entertainment spending and Bennett's firing; 2) the November 13, 2012 email between Stevens and LeBlanc; 3) Abiomed's discovery that Bennett had previously engaged in whistleblowing activity; and 4) Abiomed's handling of Bennett's dismissal. Pl.'s Opp'n 7-10 [#143]. The court addresses each in turn.

A brief interval between when an employer learns of protected conduct and when it takes an adverse action may be potentially probative of a causal relationship between the two. Here, however, there were intervening events between Bennett's alleged protected activity and the termination, namely Abiomed's discovery of what it viewed as dishonesties in the application process and Bennett's response when confronted with Abiomed's concerns. These intervening events undermine the causal relationship based on temporal proximity.

The November 13, 2012, email between Stevens and LeBlanc is similarly unhelpful for Bennett. Bennett seizes on the following line from Stevens' email as evidence from which a reasonable jury could infer retaliation: "As you know me, this is less that he was fired, as he might have presented a good explanation to us that we would have considered. Rather, it is the fact that he was not transparent (or honest) about the circumstances." Pl.'s Opp'n 8 [#143] (citing exhibit 11, email from Stevens to LeBlanc [#141-11]). Bennett argues: "If Abiomed was terminating Bennett because he lied, why would it matter whether Bennet [sic] was 'transparent

15

(or honest) about the circumstances' unless they were really concerned about the whistleblowing activities?" Pl.'s Opp'n 8 [#143]. No reasonable jury could draw this meaning from Stevens' email, which simply notes that the cause for firing Bennett does not arise from Bennett having been fired from Biotronik, but from Bennett having lied when he said he amicably parted ways with Biotronik.

Next is Bennett's assertion that Abiomed's knowledge of his previous whistleblowing demonstrates pretext. Bennett points to the distribution of the New York Times article and Bennett's recollection that Stevens said to Bennett " . . . the problem was, that [Bennett had] a reputation in the industry." Exhibit 4, Bennett Dep. 68 [#141-4]. But to the extent that Stevens made such a statement, Bennett has not provided any basis for a reasonable jury to infer that Stevens was referring to Bennett's alleged reputation for whistleblowing, as Bennett contends, rather than to a reputation for dishonesty, based on Bennett's own report to the New York Times of Biotronik's stated reason for his termination.

The final arrow in Bennett's quiver is how Abiomed handled his termination. This issue was the centerpiece of Bennett's argument during the hearing on the motion. According to Bennett, Abiomed did two things after discovering the New York Times article from which a jury could infer retaliation. First, Abiomed sought to confirm the circumstances of Bennett's termination with Biotronik. During this process, lower level staffers in Abiomed's Human Resources department reported back to Abiomed executives that attempts to verify Bennett's employment with Biotronik had been unsuccessful. Human Resources staff reported that they had "left 4 messages with [Biotronik's employment verification employee] who has not yet returned a call but we are calling back every 20-30 minutes." Exhibit 35, email from Ziegra to Howley [#144-4]. Second, Abiomed provided Bennett an opportunity to explain himself before

16

terminating his employment. As elucidated during oral argument, Bennett finds it probative of retaliatory animus that Abiomed took these steps instead of firing Bennett as soon as Stevens found the New York Times article. This cannot be an inference is that a reasonable jury could draw from this record. Abiomed's steps to confirm the accuracy of the article's statement that Biotronik had fired Bennett and to provide Bennett an opportunity to explain his statements during the interview support the contrary inference, namely, that Abiomed was concerned about Bennett's dishonesty but was careful not to jump to unwarranted conclusions.

The court recognizes that "[i]n retaliation cases, the whole is sometimes greater than the sum of the parts" and that courts should avoid overly granular analyses since bits and pieces of evidence, taken together, can have significant probative value. Harrington, 668 F.3d at 34. Here, however, the entire record of this case presents a cohesive narrative of events with regards to Bennett's hiring and termination from Abiomed. From the entire record, the court finds that no reasonable jury could find in Bennett's favor on the FCA retaliation claim and thus judgment is appropriate as a matter of law.

      B.  <u>Wrongful Termination in Violation of Massachusetts Public Policy</u>

Bennett's second claim is that his termination from Abiomed violates Massachusetts' public policy exception for at-will employment.

In Massachusetts "[e]mployment at will is terminable by either the employee or the employer without notice, for almost any reason or for no reason at all." <u>Wright v. Shriners Hosp. for Crippled Children</u>, 412 Mass. 469, 472 (1992) (citing <u>Jackson v. Action for Boston Community Dev., Inc.</u>, 403 Mass. 8, 9 (1988)). However, this rule gives way when an employee is terminated "contrary to a well-defined public policy." <u>Id.</u> Speaking broadly, the Massachusetts Supreme Judicial Court has found that the public policy exception provides redress where

employees "are terminated for asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury). Id.; see also King v. Driscoll, 418 Mass. 576, 582 (1994) (collecting cases). "It is a question of law for the judge to decide whether a retaliatory firing in these circumstances would violate public policy." Wright, 412 Mass. at 472.

As an initial matter, Plaintiff may only proceed on the public policy exception to the extent that the FCA retaliation action does not provide a remedy. As this court explained in Elliott-Lewis v. Abbott Labs., Inc., "where the relevant public policy" on which the public policy exception claim is based "has already been vindicated by a state or federal statute," the public policy exception claim is foreclosed. No. 14-CV-13155-IT, 2018 WL 1122359, at *1 (D. Mass. Mar. 1, 2018) (citing Valerio v. Putnam Assocs. Inc., 173 F.3d 35, 45 (1st Cir. 1999)). Accordingly, Plaintiff cannot proceed on a public policy claim that relates to reporting a false claim for payment.

Plaintiff argues that he was terminated because he raised concerns about "off-label" marketing. Pl.'s Opp'n 11 [#143]. Bennett contends that he asked Dr. David Weber, Abiomed's Chief Operating Officer, whether the company intended to conduct studies to expand the label for Abiomed's products. Id. (citing Exhibit 4, Bennett Dep. 131:17-132:17 [#141-4]). Per Bennett, Weber responded that the company did not plan to conduct clinical studies. Exhibit 4, Bennett Dep. 132:1-5 [#141-4]. Bennett also recalls directing the same question to Stevens with Stevens responding that he did not know the answer. Id. at 132:10-17, 153:13-15. Plaintiff does not explain how these questions concern a protected public policy or provide any evidence linking these questions to his firing. Instead, in two sentences of argument, Bennett simply calls to the court's attention deposition testimony recalling these conversations.

The court need not address Bennett's argument that raising concerns about off-label marketing is protected by the public policy exception. At bottom, the claim of wrongful termination under Massachusetts law fails for the same reason as the FCA retaliation claim: Bennett has provided no evidence of protected activity and no evidence from which a reasonable jury could find that he was fired as a result of the conversations with Weber and Stevens as opposed to for the legitimate basis Abiomed has put forth. Accordingly, summary judgment on the state law claim is appropriate.

## V. Conclusion

For the above reasons, the court GRANTS Abiomed's Motion for Summary Judgment [#137].

IT IS SO ORDERED.

Date: March 24, 2020 /s/ Indira Talwani
United States District Judge